IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 05-cv-01891-PAB-MEH

KIRK WARREN,

     Plaintiff,

v.

LIBERTY MUTUAL FIRE INSURANCE COMPANY,
a Massachusetts insurance company,

     Defendant.

_____

### ORDER AND MEMORANDUM OF DECISION
_____

     This state-law insurance case is before the Court following remand from the

Tenth Circuit Court of Appeals.  The parties remaining in the case are plaintiff Kirk

Warren and defendant Liberty Mutual Fire Insurance Company ("Liberty Mutual").  The

matter is presently before the Court on two issues reserved for the trial court by the

Tenth Circuit's remand order.  The parties have filed cross motions for partial summary

judgment regarding the first issue: whether the insurance policy in question contains an

aggregate cap on the benefits to which Kirk Warren is entitled.  The parties also have

briefed the second issue: as of what date the insurance policy in question should be

deemed to be reformed.  Although Kirk Warren did not make a formal motion for

summary judgment on the latter issue, Liberty Mutual poses its arguments under

Federal Rule of Civil Procedure 56.  Furthermore, because plaintiff seeks a ruling as a

matter of law and legal claims will remain unresolved following this order, I conclude

that it is more appropriate to address the date of reformation within the context of Rule

56 rather than, say, a trial to the Court.  The issues are fully briefed.  The Court's jurisdiction is predicated upon diversity jurisdiction under 28 U.S.C. § 1332(a).

## I. BACKGROUND

The facts of this case are recounted in detail in the February 15, 2007 order on summary judgment, *see Warren v. Liberty Mut. Fire Ins. Co.*, 505 F. Supp. 2d 770 (D. Colo. 2007) and the Tenth Circuit's order remanding this case, *see Warren v. Liberty Mutual Fire Ins. Co.*, 555 F.3d 1141 (10th Cir. 2009).  For present purposes, I summarize the following pertinent facts.  On September 29, 2002, Kurt Warren was driving a 1983 Chevrolet Suburban in which his twin brother, plaintiff Kirk Warren, was riding as a passenger.  Kurt lost control of the vehicle and it rolled over.  As a result of the accident, both of the Warren brothers suffered injuries.  As a result, Kirk Warren is now confined to a bed or wheelchair indefinitely.

At the time of the accident, Kurt Warren and the Suburban he was driving were insured under an automobile insurance policy (the "Policy") issued by defendant Liberty Mutual.  Liberty Mutual first issued the Policy to Kurt Warren in March of 1996 when Deborah Bannister, Kurt's wife, executed the Policy.  At the time that Ms. Bannister applied for the Policy, she met with Liberty Mutual's sales representative, Doug Maxey.  At this meeting, Ms. Bannister executed an automobile insurance policy application together with the fourth page of a Colorado personal injury protection ("PIP") options disclosure form ("1996 PIP Disclosure Form").  The 1996 PIP Disclosure Form provides a variety of options with respect to "Basic PIP coverage" as well as "Added PIP coverage" or "APIP coverage."  The form says the following about the APIP coverage:

2

ADDED PERSONAL INJURY PROTECTION BENEFITS

You may elect to purchase an Added PIP Medical Expense option, and [sic] Added PIP Work Loss Option, or a combination of these two options applying to you and any family member for a reasonable increase in premium. If you elect either of the following, the $50,000 per person limit of benefits is increased to $200,000 per person for any one accident.

i)      ADDED PIP MEDICAL EXPENSES – provides the same medical expense coverage as Basic PIP except that losses are not limited to those incurred within five (5) years after the date of the accident.

ii)     ADDED PIP WORK LOSS – provides the same Work Loss Coverage as Basic PIP except there is no 52 week time limitation and coverage is not subject to a weekly dollar limit.

iii)    ADDED PIP MEDICAL EXPENSES AND ADDED PIP WORK LOSS – provides a combination of i) and ii) above.

Resp. in Opp'n to Pl.'s Mot. for Partial Summ. J. Re: Aggregate Limit [Docket No. 110] ("Def.'s Resp. Re: Aggregate Limit"), ex. A at 10.[1]  Ms. Bannister selected one of the Basic PIP coverage offerings and declined all forms of the offered APIP coverage.

At the time Liberty Mutual first issued the Policy to Ms. Bannister in 1996, neither the application nor the Policy, by their terms, offered or extended APIP coverage to guest occupants of the insured vehicles or to pedestrians. Furthermore, the policy itself did not reference a specific aggregate limit for APIP coverage. However, Mr. Maxey, the insurance agent, testified at his deposition that, while he has no personal recollection of doing so in this case, it was his practice to review orally the APIP provisions with potential customers. *See* Def.'s Resp. Re: Aggregate Limit, ex. G at 4-6, 9, 18. The reviewed provisions of the application included a standard $200,000 per-

---

[1] All references to exhibit page numbers refer to the location within the exhibit, irrespective of internal pagination.

person-per-accident aggregate cap on APIP benefits.   *See* Def.'s Resp. Re: Aggregate

Limit, ex. G at 18.   Liberty Mutual also asserts through an assistant vice president, Hall

Crowder, that during this time period "it was [Liberty Mutual's] practice in Colorado to

specify the $200,000 aggregate limit for basic PIP and APIP on the Declarations page

of a policy."   Def.'s Resp. Re: Aggregate Limit, ex. D ¶ 9.   In fact, Mr. Crowder states in

an affidavit that Liberty Mutual "did not sell unlimited APIP coverage in Colorado and

only sold such coverage subject to an aggregate limit of $200,000 per person per

accident . . . ."   Def.'s Resp. Re: Aggregate Limit, ex. D ¶ 11.

Although repealed in 2003, at the time Liberty Mutual first issued the Policy to

Kurt Warren and at the time of the accident that injured the Warren brothers, the

Colorado Auto Accident Reparations Act ("CAARA"), Colo. Rev. Stat. §§ 10-4-701 to

-726 (2002), contained mandates related to APIP coverage.   For example, at the time

of the accident in 2002, CAARA required that:

> Every insurer shall offer the following enhanced benefits for inclusion in a
> complying policy, in addition to the basic coverages described in section
> 10-4-706, at the option of the named insured:
>
> (I)   Compensation of all expenses of the type described in section
>        10-4- 706(1)(b) without dollar or time limitation; or
>
> (II)   Compensation of all expenses of the type described in section
>        10-4- 706(1)(b) without dollar or time limitations and payment of
>        benefits equivalent to eighty-five percent of loss of gross income
>        per week from work the injured person would have performed had
>        such injured person not been injured during the period
>        commencing on the day after the date of the accident without dollar
>        or time limitations.

Colo. Rev. Stat. § 10-4-710(2)(a) (2002).   Despite the reference above to "expenses . . .

without dollar or time limitation," CAARA permits insurers to place a $200,000 per-

person-per-accident cap on APIP coverage.  *Brennan v. Farmers Alliance Mut. Ins. Co.*, 961 P.2d 550, 555 (Colo. App. 1998); *see* Colo. Rev. Stat. §§ 10-4-710(2)(b) (2002) ("A complying policy may provide that all benefits set forth in section 10- 4-706(1)(b) to (1)(e) and in this section are subject to an aggregate limit of two hundred thousand dollars payable on account of injury to or death of any one person as a result of any one accident arising out of the use or operation of a motor vehicle.").

Before 1998 it was unclear exactly to whom APIP coverage must apply and, as a result, what offer of APIP coverage conformed with CAARA's mandate.  In 1998, however, the Colorado Court of Appeals held in *Brennan v. Farmers Alliance Mutual Insurance Co.* that an insurer's offer of APIP coverage must specifically reference four categories of individuals: 1) the named insureds; 2) resident relatives of the named insureds; 3) passengers occupying the insured's vehicle with the consent of the insureds – the so-called guest occupants; and 4) pedestrians who are injured by the covered vehicle.  961 P.2d 550 (Colo. App. 1998).  Where an insurer fails to offer APIP coverage for any of these four groups, the policy in question must be reformed to include coverage for the omitted group or groups.  *See*, *e.g.*, *Warren*, 555 F.3d at 1147-48; *see generally Thompson v. Budget Rent-A-Car Sys., Inc.*, 940 P.2d 987, 990 (Colo. App. 1996) ("When an insurer fails to offer the insured optional coverage that it is statutorily required to offer, additional coverage in conformity with the required offer is incorporated into the agreement by operation of law.").

It was not until December 21, 2001 that Liberty Mutual modified its PIP endorsement in its policies to comply with the *Brennan* decision by extending APIP

coverage to guest occupants and pedestrians.  This Court previously concluded, and the Tenth Circuit affirmed, that there was insufficient evidence that the insureds, Kurt Warren and Deborah Bannister, received this endorsement or any other notification that APIP coverage was available to guest occupants and pedestrians.  *See Warren*, 555 F.3d at 1146.

Following the accident, both Kurt and Kirk Warren submitted claims to Liberty Mutual.  Liberty Mutual paid benefits to the brothers under Basic PIP coverage, but not under APIP coverage.  Believing they were entitled to have the Policy reformed to include APIP coverage, Kurt and Kirk Warren filed a complaint in this Court on September 29, 2005.  The complaint asserted a claim seeking reformation of the insurance contract, a claim for breach of contract of the Policy, and several statutory and common law bad faith claims.

In July 2006, the parties filed cross-motions for summary judgment [Docket Nos. 34, 38] that encompassed all of plaintiffs' claims.  On February 15, 2007, then-Chief Judge Edward W. Nottingham granted summary judgment in favor of Liberty Mutual on all of the plaintiffs' claims [Docket No. 67].  Judge Nottingham held that Liberty Mutual did not violate the rules regarding offers and disclosure contained in §§ 10-4-706(4)(a) and 10-4-111 of the Colorado Revised Statutes or the standard from *Allstate Insurance Co. v. Parfrey*, 830 P.2d 905, 913 (Colo. 1992) ("[A]n insurer has a one-time duty to inform an insured in a reasonable manner calculated to permit the insured to make an informed decision on whether to purchase [the] coverage . . . ."); *see Warren*, 555 F.3d at 1147.  However, Judge Nottingham concluded that Liberty Mutual did violate § 10-4-710(2)(a) by failing to offer APIP coverage to guest occupants and pedestrians.  *See*

6

*Warren*, 505 F. Supp. 2d at 780-81.  However, because he believed that both plaintiffs were covered within the 1996 PIP Disclosure Form's reference to "you and any family member," Judge Nottingham deemed the violation of § 10-4-710(2)(a) to be immaterial.

The Warren brothers appealed Judge Nottingham's decision.  On February 11, 2009, the Tenth Circuit affirmed the district court's conclusions regarding §§ 10-4-706(4)(a) and 10-4-111 and *Parfrey*.  However, after Liberty Mutual conceded that the 1996 PIP Disclosure Form's reference to "you and any family member" did not, in fact, cover Kirk Warren, the Tenth Circuit revisited the § 10-4-710(2)(a) issue.  The court first addressed Liberty Mutual's argument, which was raised initially before Judge Nottingham, that pursuant to *Hill v. Allstate Ins. Co.,* 479 F.3d 735 (10th Cir. 2007), the offer made to Deborah Bannister and Kurt Warren was sufficient.  The Tenth Circuit affirmed Judge Nottingham's conclusion that *Hill* was inapplicable.  *See Warren*, 555 F.3d at 1146.  The Tenth Circuit also agreed with the district court that the undisputed evidence indicated that Liberty Mutual failed to provide Kurt Warren and Deborah Bannister with proper notice of the APIP coverage for guest occupants and pedestrians. *See Warren*, 555 F.3d at 1146.  Finally, because Kirk Warren qualified as a guest occupant rather than a "family member," the Tenth Circuit concluded that he was entitled to reformation of the Policy so as to add APIP benefits covering him.  *See Warren*, 555 F.3d at 1147.  As a result, the Court of Appeals reversed the entry of summary judgment in favor of Liberty Mutual on Kirk Warren's claims.  *See Warren*, 555 F.3d at 1149.  However, because it affirmed the district court's conclusion that Deborah Bannister and Kurt Warren received sufficient notice and offer of APIP

benefits covering insured persons such as Kurt Warren, the Tenth Circuit concluded that Kurt was not entitled to reformation. *See Warren*, 555 F.3d at 1147-48.  The Tenth Circuit, therefore, affirmed summary judgment against Kurt Warren, thereby resolving all of his claims.  *See Warren*, 555 F.3d at 1149.

The question whether reformation is appropriate is distinct from the questions of how and when reformation should occur. *Breaux v. American Family Mut. Ins. Co.*, 554 F.3d 854, 867 (10th Cir. 2009).  Therefore, having settled the issue of whether the plaintiffs were entitled to reformation of the Policy, the Tenth Circuit remanded Kirk Warren's case with instructions that this Court decide the details of reformation. Specifically, this Court must now decide "whether the reformed policy should be subject to an aggregate cap, the date of reformation, and the viability of Kirk Warren's claims for breach of contract, willful and wanton statutory bad faith, breach of the implied covenant of good faith and fair dealing, and common law bad faith." *Warren*, 555 F.3d at 1149.

Upon remand, this case was reassigned to me.  Soon thereafter, the parties filed cross-motions for partial summary judgment on the question of whether the Policy should be reformed to include an aggregate cap on the benefits to which Kirk Warren is entitled [Docket Nos. 99, 111].  These motions have been fully briefed [Docket Nos. 110, 115, 116, 120] and are ripe for disposition.  The parties also briefed separately the question of the effective date of reformation [Docket Nos. 119, 121, 123], which the Court takes up as well.

## II. ANALYSIS

### A.  Legal Standard

"In diversity cases like this one, the substantive law of the forum state governs the analysis of the underlying claims, but we are governed by federal law in determining the propriety of . . . summary judgment."  *Hill v. Allstate Ins. Co.*, 479 F.3d 735, 739 (10th Cir. 2007) (internal quotation marks omitted).  According to Federal Rule of Civil Procedure 56(c), a court should grant summary judgment where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).

Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.  *Faustin v. City & County of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  A disputed fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson*, 477 U.S. at 248).

As for the evidence a court may consider in the context of a summary judgment motion, only admissible evidence may enter the analysis.  *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).  In viewing the permissible evidence, courts are to make reasonable inferences therefrom in the light most

favorable to the nonmoving party.  *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274

(10th Cir. 1998).  However, where, as here, there are cross-motions for summary

judgment, the reasonable inferences drawn from affidavits, attached exhibits, and

depositions are rendered in the light most favorable to the non-prevailing party.

*Jacklovich v. Simmons*, 392 F.3d 420, 425 (10th Cir. 2004).  Furthermore, "[w]hen the

parties file cross motions for summary judgment, we are entitled to assume that no

evidence needs to be considered other than that filed by the parties, but summary

judgment is nevertheless inappropriate if disputes remain as to material facts."  *Atlantic*

*Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000)

(internal quotation marks omitted).

### B.  Reformation

"Generally, the purpose of reformation of an insurance contract is to make the

policy express the true intent of the parties.  However, when a policy is violative of a

statute, reformation is also required to assure that coverage will meet the statutory

minimums."  *Clark v. State Farm Mut. Auto. Ins. Co.*, 433 F.3d 703, 710 (10th Cir. 2005)

("*Clark II*") (quoting *Thompson v. Budget Rent-A-Car Sys., Inc.*, 940 P.2d 987, 990

(Colo. App. 1996)).  Relevant to the present case, the Colorado Court of Appeals has

held that "when an insurer fails to offer the insured optional coverage that satisfied

CAARA, additional coverage in conformity with the offer mandated by statute will be

incorporated into the policy."  *Clark II*, 433 F.3d at 710 (quoting *Brennan v. Farmers*

*Alliance Mut. Ins. Co.*, 961 P.2d 550, 554 (Colo. App. 1998)) (internal omission marks

and alteration marks omitted).

### 1. The Aggregate Cap

"Where an insurance policy is reformed by the court, the reformed policy will be subject to an aggregate cap if the original policy included an aggregate cap." *Warren v. Liberty Mutual Fire Ins. Co.*, 555 F.3d 1141, 1148 (10th Cir. 2009) (citing *Brennan*, 961 P.2d at 555). On the other hand, "[i]f the original policy did not include an aggregate cap, the reformed policy will likewise not be capped." *Warren*, 555 F.3d at 1148 (citing *Thompson*, 940 P.2d at 991).

Liberty Mutual does not argue that the Policy contains an explicit $200,000 cap on APIP coverage. Indeed, the Court can find no reference anywhere in the Policy to such a limit. Liberty Mutual instead relies mostly on facts extrinsic to the Policy to argue that the aggregate APIP benefits for any single guest occupant should be capped at $200,000. For example, Liberty Mutual relies on the assertions of its assistant vice president, Hall Crowder, regarding the availability in Colorado of per-person-per-accident coverage in excess of $200,000. Liberty Mutual also points to the 1996 PIP Disclosure Form which Ms. Bannister signed upon first executing the Policy with Liberty Mutual. That form, while it made the mistake of omitting reference to guest occupants, stated that "[i]f you elect either of the following [APIP options], the $50,000 per person limit of benefits is increased to $200,000 per person for any one accident." Def.'s Resp. Re: Aggregate Limit, ex. A at 10. Finally, Liberty Mutual cites the deposition testimony of its sales agent, Doug Maxey, in which he stated that it was his practice to orally inform applicants that the optional additional coverages were capped at $200,000 per person per accident.

Based upon the review of company records, Mr. Crowder stated in an affidavit the following regarding the $200,000 aggregate cap:

> Between 1996 and 2002, it was [Liberty Mutual's] practice in Colorado to specify the $200,000 aggregate limit for basic PIP and APIP on the Declarations page of a policy. If an insured elected to purchase APIP benefits from [Liberty Mutual], the reference to the aggregate limit of $200,000 per person per accident was set forth in the Declarations page of the applicable Colorado policy.
>
> Attached to the Response Brief as Exhibit E is a sample of Declarations pages from a number of policies issued by [Liberty Mutual] in Colorado through 2002, which illustrate the business practice of [Liberty Mutual] to specify the $200,000 aggregate limit on the Declarations page of any policy which afforded APIP coverage. This practice was consistent with the terms of the 2001 PIP Endorsement, which permitted the selection of APIP and the aggregate limit applicable to APIP benefits to be stated on the Declarations page of the policy.
>
> [Liberty Mutual] did not sell unlimited APIP coverage in Colorado and only sold such coverage subject to an aggregate limit of $200,000 per person per accident, as permitted by former C.R.S. § 10-4-710(2)(b) and as illustrated in the Declarations pages of the policies attached to the Response Brief as Exhibit E
>
> If APIP coverage had been selected and purchased by the insureds, Deborah Bannister and Kurt Warren, the Declarations page on the Policy would have reflected the selection of APIP coverage and the applicable $200,000 aggregate limit . . . . However, because the insureds did not elect to purchase APIP coverage, the $200,000 aggregate limit applicable was not expressed in the Declarations page of the Policy. As illustrated by Exhibit E, consistent with [Liberty Mutual's] business practice and underwriting procedures, the aggregate limit of $200,000 per person per accident would have been stated on the Declarations page of the Policy if APIP coverage had been purchased by the insureds.

Def.'s Resp. Re: Aggregate Limit, ex. D ¶¶ 9-12.

While the implication of these assertions is that it would have been impossible for Ms. Bannister and Mr. Warren to get a policy from Liberty Mutual without a $200,000 aggregate cap, Mr. Crowder stops short of actually saying that. Mr. Crowder does not,

for example, claim that Liberty Mutual would never provide coverage above the $200,000 aggregate cap if a customer requested it.  Instead, Mr. Crowder's testimony demonstrates that Liberty Mutual had not provided APIP coverage to prospective customers without a $200,000 per-person-per-accident limit, not that, as a matter of internal policy, it would never offer it without such a limit.

More importantly, however, reliance on this and the other extrinsic evidence, including the 1996 PIP Disclosure Form and Mr. Maxey's testimony, is problematic. The provision of CAARA which permits the $200,000 aggregate cap states that "[a] complying *policy* may provide that all benefits . . . are subject to an aggregate limit of two hundred thousand dollars . . . ."  Colo. Rev. Stat. § 10-4-710(2)(b) (2002) (emphasis added).  This provision makes no reference to applications, representations of sales representatives, or insurers' common practices.  All courts to interpret this statute, including the cases cited by Liberty Mutual, have looked to the policy itself for an expression of an aggregate cap on per-person-per-accident APIP benefits.  *See* Def.'s Cross-Mot. for Partial Summ. J. to Impose the $200,000 Aggregate Limit on APIP Benefits [Docket No. 111] at 4-5 (citing *May v. Travelers Prop. Cas. Co. of Am.*, 263 F. App'x 673, 687 (10th Cir. 2008); *Breaux v. Am. Fam. Mut. Ins. Co.*, 387 F. Supp. 2d

1154, 1165-66 (D. Colo. 2005);[2] *Snipes v. Am. Fam. Mut. Ins. Co.*, 134 P.3d 556, 558-59 (Colo. App. 2006)*; Brennan v. Farmers Alliance Mut. Ins. Co.*, 961 P.2d 550, 555 (Colo. App. 1998)); *see also Breaux v. American Family Mut. Ins. Co.*, 554 F.3d 854, 858 (10th Cir. 2009).  Most of these cases rely on the fact that the $200,000 limit appeared in endorsements, which generally are considered to be part of a policy. *Brennan*, 961 P.2d at 555 (citing *Martinez v. Hawkeye-Security Ins. Co.*, 576 P.2d 1017 (1978)).  Indeed, the Tenth Circuit in this very case directed the Court to look to the policy.  *See Warren*, 555 F.3d at 1148 ("[T]he reformed policy will be subject to an aggregate cap if the original *policy* included an aggregate cap.  If the original *policy* did not include an aggregate cap, the reformed policy will likewise not be capped." (internal citation omitted) (emphasis added)).

Furthermore, not one of the cases cited by Liberty Mutual relies on insurance applications, representations by sales personnel, common practices of the insurer, or the insurer's *post hoc* statements regarding its intent in order to devise an aggregate limit.  In fact, on at least one occasion, the Colorado Court of Appeals refused to

---

[2] It is somewhat more difficult to characterize the analysis in *Breaux*, 387 F. Supp. 2d at 1165-66.  While the court made reference to a table in the "insurance policy application," this statement is at odds with its ultimate conclusion that "[t]he $200,000 aggregate limit, which is authorized by statute, was unambiguously presented on the PIP *endorsement* document presented to Plaintiff upon issuance of her policy, and therefore was part of her policy."  *Breaux*, 387 F. Supp. 2d at 1166 (emphasis added); *see also Breaux v. American Family Mut. Ins. Co.*, 554 F.3d 854, 858 (10th Cir. 2009) ("Plaintiffs acknowledge that the PIP *endorsements* contain the language 'AGGREGATE LIMIT – $200,000 per person' . . . ."); *Breaux*, 387 F. Supp. 2d at 1159 ("Plaintiff's policy contained an *endorsement* reflecting a $200,000 aggregate limit on optional extended PI." (emphasis added)).  Indeed, subsequent citations to the analysis in *Breaux* have tied similar inferences to the language of the policies themselves.  *See, e.g.*, *Clark II*, 433 F.3d at 711.

14

consider a document extrinsic to the policy as evidence regarding an aggregate cap. *See Brennan*, 961 P.2d at 554-55 (noting that a "Policy Notice" attached to the policy was not part of the policy and would not be considered in order to demonstrate that no aggregate limit on APIP benefits existed).

As for Liberty Mutual's claim that, had Deborah Bannister and Kurt Warren accepted APIP coverage for themselves and their family members, Liberty Mutual would have included a $200,000 aggregate limit on APIP benefits, no court has entertained such considerations.  The Colorado Court of Appeals has refused to engage in *post hoc* speculation about what would have happened had the insurer complied with CAARA.  The court in *Thompson* explained that the likelihood that an insured would have purchased APIP benefits had the insurer offered them was irrelevant because, in the words of another court, "[n]ot only would that determination be too speculative, it would allow insurers to circumvent the intent of the legislature." *See Thompson*, 940 P.2d at 991 (quoting *Kuchenmeister v. Illinois Farmers Ins. Co.*, 310 N.W.2d 86, 88 (Minn. 1981)); *see also Warren*, 555 F.3d at 1147.  Here, determining what would have happened if Liberty Mutual had, in fact, offered compliant APIP coverage – i.e., would Ms. Bannister have accepted it and would Liberty Mutual have imposed a $200,000 aggregate limit – is similarly speculative and contrary to the legislative purposes behind CAARA.  *Cf. Allstate Ins. Co. v. Avis Rent-A-Car Sys., Inc.*, 947 P.2d 341, 346-47 (Colo. 1997) ("The first purpose of CAARA is to avoid inadequate compensation to victims of automobile accidents; the second is to require registrants of motor vehicles in the state to procure insurance covering legal liability for owned

15

automobiles; the third is to provide benefits to vehicle occupants and others who are injured.  In each of these purposes, CAARA contemplates that insurers will act quickly and fairly to provide compensation for the loss so that delayed payment and continued uncertainty will not prolong the travail of both the injured and the insured parties." (internal citation omitted)).

In the present case, the Tenth Circuit affirmed the district court's conclusion that Liberty Mutual made a compliant offer of APIP benefits with respect to two of the four groups required by CAARA: the insureds and certain family members of the insureds. What Liberty Mutual failed to do was offer similar coverage to guest occupants and pedestrians.  Liberty Mutual contends that, because its offer of APIP benefits to insureds and their family members included a $200,000 per-person-per-accident limit, the same limit should be imputed upon the Policy as to all categories of covered persons.  However, the documents themselves counsel against such a result.  For example, the 1996 PIP Disclosure Form explains:

> Please be aware that any summary of coverages on this page are necessarily general in nature.  Your policy will contain specific descriptions, definitions, exclusions and conditions.  In case of any conflict, your policy language will control the resolution of all coverage questions.

Def.'s Resp. Re: Aggregate Limit, ex. A at 10.  Furthermore, the Policy states under the heading "Changes" that "[t]his policy contains all of the agreements between you and us.  Its terms may not be changed or waived except by endorsement issued by us." Pl.'s Mot. for Partial Summ. J. and Br. in Supp. Re: Aggregate Limit [Docket No. 99] ("Pl.'s Mot. Re: Aggregate Limit"), ex. 1 at 14.  Therefore, by the terms of the agreements themselves, extrinsic evidence does not alter the terms of the Policy.

16

While the court in *Thompson* found that the insurer in that case failed to include an aggregate limit in its policy, Liberty Mutual contends that *Thompson* nevertheless argues in favor of considering extrinsic evidence to establish such a limit.  However, in doing so, Liberty Mutual misreads the *Thompson* court's statement that the insurer "could have included in its rental agreement a provision for a $200,000 cap for all benefits," but did not do so.  *Thompson v. Budget Rent-A-Car Systems, Inc.*, 940 P.2d 987, 991 (Colo. App. 1996).  Liberty Mutual believes that the reference to the "rental agreement" authorizes publication of an aggregate limit on APIP coverage outside of an insurance policy.  What Liberty Mutual fails to grasp, however, is that, because the insurer in *Thompson* was a car-rental company that self-insured its customers, the rental agreement itself incorporated the policy.  *See Thompson*, 940 P.2d at 989 ("The insurance portion of the rental agreement provided, in pertinent part . . . .").  As a consequence, *Thompson* does not provide support for Liberty Mutual's reliance on extrinsic existence to establish an aggregate limit on APIP coverage.

Furthermore, although no party directly argues this point, the Court notes that Liberty Mutual would not fare any better if the Policy language regarding aggregate limits was deemed to be ambiguous.  The Policy says the following with respect to APIP limitations:

- the "Limit of Liability" for "Medical Expenses" is listed as "No specific dollar amount";

- the "Limit of Liability" for "Medical Expenses And Work Loss Medical Expenses" is listed as "No specific dollar amount for medical expenses"; and

- the "Maximum Limit Of Liability For The Total Of All Basic And Added Personal Injury Protection Benefits" is listed as "$ [blank space]."

17

Pl.'s Mot. Re: Aggregate Limit, ex. 1 at 25.  In order for Liberty Mutual to prevail, the Court would have to interpret the blank space as an ambiguous reference that could be clarified by the extrinsic evidence.

In making an ambiguity determination, courts are to view the policy as a whole, using the generally accepted meaning of the terms employed.  *USAA Cas. Ins. Co. v. Anglum*, 119 P.3d 1058, 1060 (Colo. 2005).  A term is ambiguous if it is susceptible to more than one reasonable interpretation.  *Hoang v. Assurance Co. of Am.*, 149 P.3d 798, 801 (Colo. 2007).  By finding that a term is ambiguous, a Court may indeed look to extrinsic evidence in order to establish its meaning.  *See Fort Lyon Canal Co. v. High Plains A & M, LLC*, 167 P.3d 726, 728-29 (Colo. 2007).

In the present case, even if the Court determined that the blank space following the aggregate limit language was ambiguous, neither the Policy as a whole nor the extrinsic evidence provides sufficient guidance to impose a $200,000 aggregate limit. First of all, in deciding the meaning of ambiguous terms, courts may not consider extrinsic expressions of intent by the parties.  *Public Serv. Co. of Colo. v. Meadow Island Ditch Co. No. 2*, 132 P.3d 333, 339 (Colo. 2006).  Therefore, Mr. Crowder's statements regarding Liberty Mutual's intent do not impact the determination. Furthermore, Liberty Mutual has not asserted that it would have been impossible for Ms. Bannister and Mr. Warren to obtain coverage without the $200,000 aggregate limit, only that it had not happened.  Nor does the 1996 PIP Disclosure Form necessarily clarify things.  On the one hand, the form explains that if the applicant elects the Added PIP Medical Expense option, the Added PIP Work Loss Option, or a combination of

these two options, "the $50,000 per person limit of benefits is increased to $200,000 per person for any one accident."  Def.'s Resp. Re: Aggregate Limit, ex. A at 10.  However, this statement itself is ambiguous.  The PIP endorsement provides a separate $50,000 liability limit under each listing, once under "Medical Expenses" and once under "Rehabilitation Expenses," and provides no explicit cap for "Work Loss" and no per person per accident cap, *see* Pl.'s Mot. Re: Aggregate Limit, ex. 1 at 25.[3]  Based on the 1996 PIP Disclosure Form, it is not clear how the $200,000 limit it mentions would translate to the endorsement.  Furthermore, the form also appears to contradict itself when it says that APIP coverage "provides the same medical expense coverage as Basic PIP" minus a time limit, making no mention of a $200,000 cap.  *See* Def.'s Resp. Re: Aggregate Limit, ex. A at 10.  The form also contradicts the Policy by stating that APIP coverage "provides the same Work Loss Coverage as Basic PIP except there is no 52 week time limitation and coverage is not subject to a weekly dollar limit."  *See* Def.'s Resp. Re: Aggregate Limit, ex. A at 10.  The endorsement in the Policy which contains the APIP language in fact provides work loss benefits under a different calculation than is offered under basic PIP coverage.  *See* Pl.'s Mot. Re: Aggregate Limit, ex. 1 at 25.

There are also temporal and logical problems in allowing the 1996 PIP Disclosure Form to affect the meaning of an endorsement produced five years later in 2001.  First, the 1996 PIP Disclosure Form says nothing about APIP benefits to guest occupants.  It seems illogical to allow that document to limit those benefits.

---

[3] As discussed below, some courts have gone through the trouble of calculating one.  *See, e.g.*, *Breaux*, 387 F. Supp. 2d at 1165 & n.5.

19

Furthermore, to gauge the parties' intent in 2001 based upon a form signed in 1996 strains reasonableness just in terms of the temporal proximity.  Finally, the Policy contains a merger, or integration, clause which precludes consultation of extrinsic evidence.  On most occasions insurers are loath to betray these clauses.  Although the equitable nature of reformation may provide the Court with some leeway when it comes to the interpretation of contracts, equity does not require a double standard, whereby analysis is confined to the four corners of a policy when it suits an insurer's needs, *see e.g.*, Resp. in Opp'n to Pl.'s "Br. Re: Effective Date" [Docket No. 121] ("Def.'s Resp. Re: Reformation Date") at 6, but extrinsic evidence will control when the insurer finds that preferable, *see*, *e.g.*, Def.'s Resp. Re: Aggregate Limit, ex. A at 11-15.

The typical implication of a blank space or the statement that there is "no specific dollar amount" is that there is variability in those amounts.  The context of the Policy bears this out.  For example, the only other blank dollar amount in the PIP endorsement is the description of the deductible for medical and rehabilitation expenses.  *See* Pl.'s Mot. Re: Aggregate Limit, ex. 1 at 25.  That amount is left unstated in the endorsement presumably because, as the record shows, Liberty Mutual offers more than one possible deductible.  Leaving a blank dollar amount in the portion of the endorsement describing the maximum APIP coverage carries the same connotation.

In fact, if Liberty Mutual intended to always limit APIP coverage to $200,000 per person per accident, it should have put that limit in the endorsement.  Based on § 10-4-710(2)(b), the aggregate amount could never be less than $200,000.  If Liberty Mutual is to be believed, the amount also could never go above $200,000.  Therefore, there

would be no question that the amount in the blank space would read "$200,000" on every policy in Colorado.  For reasons that are unclear, however, it does not.

Liberty Mutual claims that it did not include the $200,000 figure because Ms. Bannister did not accept any APIP benefits.  Had she accepted the APIP benefits, Liberty Mutual contends that the limit would have appeared on the declarations page of the Policy, the way it did on the customers' declarations pages attached to Liberty Mutual's response on the aggregate limit issue.  *See generally* Def.'s Resp. Re: Aggregate Limit, ex. E.  The risk associated with omitting the $200,000 aggregate limit unless a policyholder accepted APIP benefits should have been abundantly clear after *Thompson v. Budget Rent-A-Car Systems, Inc.*, 940 P.2d 987, 991 (Colo. App. 1996), was decided.  By not including an aggregate limit on APIP benefits, Liberty Mutual ran the risk of being liable without limitation for APIP benefits under the Policy.

Liberty Mutual also argues that it omitted exact dollar amounts regarding APIP coverage in the endorsement in order to avoid confusing its insureds about their level of coverage.  However, in light of the language used in this and other endorsements, the argument lacks credibility.  The Policy is by no means a model of clarity, and any potential confusion regarding an insured's coverage could have been avoided through more precise language.  For example, a disclaimer could have stated that the figures in the APIP section do not apply in all circumstances.  In fact, the endorsement contains just such a disclaimer: "If indicated as applicable below or in the Declarations, the following added personal injury protection benefits apply, instead of the corresponding basic personal injury protection benefits . . . ."  Pl.'s Mot. Re: Aggregate Limit, ex. 1 at 25.  Despite this disclaimer, the endorsement omitted a limit on APIP benefits that

21

would have applied in the event APIP coverage was selected.  Furthermore, if Liberty

Mutual did not want to make specific commitments regarding APIP benefits, it could

have omitted reference to them altogether in policies where they were not applicable.

Liberty Mutual's position is undermined further by the fact that APIP

endorsement language elsewhere creates the conflict that Liberty Mutual claims it

hoped to avoid by leaving the aggregate space blank.  For example, the APIP portion of

the PIP endorsement states that "85% of any loss of gross income in excess of $125

[per week]" would be covered.  This coverage, which is required under §

10-4-710(2)(a)(II), differs from the calculation under the endorsement's basic PIP

coverage.  *See* Pl.'s Mot. Re: Aggregate Limit, ex. 1 at 25.  Other endorsements to the

Policy also belie Liberty Mutual's present contention that it omitted a specific aggregate

cap in order to avoid confusion.  For example, the Policy includes an endorsement

detailing optional reduced personal injury protection which contains specific figures that

are inconsistent with basic PIP coverage.  *See* Pl.'s Mot. Re: Aggregate Limit, ex. 1 at

17.  It seems unlikely that Liberty Mutual would have included the figures for one

irrelevant level of coverage yet omitted the figures for another if its goal was to avoid

confusion.  A more reasonable interpretation is that the blank space corresponding to

the aggregate limit on APIP benefits signifies that there was no set figure to be inserted

therein.

Finally, I note that, to the extent that the statements regarding APIP benefits are

ambiguous, Colorado law holds that they are to be construed in favor of coverage.  *See*

*State Farm Mut. Auto. Ins. Co. v. Nissen*, 851 P.2d 165, 167 (Colo. 1993).  Therefore,

the 1996 PIP Disclosure Form will not serve to place a "$200,000" figure in the blank

space in the APIP endorsement that corresponds to the aggregate limit on coverage, which would have the effect of limiting coverage.

Liberty Mutual cites to several cases where some courts have inferred or found indirect support for a $200,000 aggregate limit in the policy at issue, although the policies did not include a clearly identifiable aggregate limit.  For example, in *Fincher v. Prudential Property & Casualty Insurance Co.*, Judge Blackburn inferred a $200,000 cap from the fact that the insurance policy placed a $150,000 limit on APIP coverage. No. 00-cv-02098-REB-MJW, slip op. (D. Colo. Feb. 28, 2006).  While the level of the cap was impermissible under the operative version of CAARA, Judge Blackburn read the existence of a limit, albeit an impermissible one, to suggest that the insurer intended to limit coverage.  *Fincher*, No. 00-cv-02098-REB-MJW, slip op. at 24-29.  As a result, the policy in that case was reformed to include a $200,000 aggregate limit rather than unlimited coverage.

In another case from this District, the court inferred the existence of a cap, in part, by calculating the maximum benefits available under the policy's terms.  *See Breaux*, 387 F. Supp. 2d at 1165.  However, and significantly so, the endorsement which provided the figures for the calculation also stated: "DELUXE PIP AGGREGATE LIMIT – $200,000 per person."  *Breaux*, 387 F. Supp. 2d at 1165.  In *Clark II*, the Tenth Circuit tracked the analysis in *Breaux* and concluded that the insurer "need not specifically include a $200,000 aggregate limit" where the policy explicitly specified a $200,000 limit elsewhere and the coverage selected could not possibly provide PIP

benefits exceeding that amount.   433 F.3d at 711; *see also Warren*, 555 F.3d at 1148 n.8 (citing *Clark II*).

It is not entirely clear where the line is drawn regarding inferred aggregate limits. For example, the court in *Thompson* did not make such an inference where the policy stated: "If any coverage herein cannot be excluded or waived renter agrees that such coverage shall be automatically reduced to the minimum requirements of the applicable financial responsibility law." *Thompson*, 940 P.2d at 989.  Furthermore, the cases cited above are different from the present case in significant ways.  For one thing, unlike the policy in *Fincher*, the policy Liberty Mutual issued to Deborah Bannister and Kurt Warren did not contain a specific, yet impermissible, limitation on APIP coverage. Furthermore, while the policies in *Breaux* and *Clark II* contained the "$200,000" figure, just in an inartful way, the Policy here does not.  Therefore, the inferential link in the present case is more attenuated than in those cases.  Furthermore, unlike the policies in *Clark II* and *Breaux*, the PIP endorsement in the Policy indicates that the unspecified maximum limit is for both "Basic *And* Added Personal Injury Protection Benefits," and the Policy otherwise fails to offer figures from which a maximum benefit could readily be derived.  Pl.'s Mot. Re: Aggregate Limit, ex. 1 at 25 (emphasis added).

Liberty Mutual complains in its response brief that this result "create[s] a fiction (a policy providing unlimited APIP benefits) and afford[s] [Kurt Warren] a benefit (unlimited APIP coverage) that no premium-paying policyholder or insured of Liberty Mutual Fire ever received or could have purchased."  Def.'s Reply in Supp. of Cross-Mot. for Partial Summ. J. to Impose $200,000 Aggregate Limit on APIP Benefits [Docket No. 120] at 2.

Liberty Mutual's argument, while well-taken, goes to the heart of statute-based reformation.  After all, reading any APIP benefits whatsoever into the Policy forces a fiction upon it.  However, in order to effectuate the intent behind state statutes, Colorado courts do exactly this and impose the statutory requirements upon insurers, fiction or no fiction.

### 2.  Date of Reformation

The Tenth Circuit directed this Court, on remand, to decide the effective date of reformation of the Policy.  *Warren*, 555 F.3d at 1149.  The Tenth Circuit also provided a non-exclusive list of potential reformation dates: (1) the date the Policy was issued; (2) the date Judge Nottingham issued his order on summary judgment and should have reformed the Policy;[4] (3) the date of the *Brennan* decision; and (4) the date this Court, on remand, ultimately reforms the Policy in favor of Kirk Warren.  *Warren*, 555 F.3d at 1149.

"The effective date of reformation is an equitable decision to be determined by the trial court based on the particular circumstances of each case."  *Warren*, 555 F.3d at 1148-49 (alteration marks omitted).  The Court is guided in this determination by several factors, including: (1) the degree to which a particular effective date would upset past practices on which the parties may have relied, including consideration of whether the insurer could have anticipated the rule in *Brennan*; (2) how reformation from a particular effective date would further or retard the purpose of the rule in *Brennan*; and

---

[4] This particular date analogizes to the Tenth Circuit's actual statement: "the date the trial court in *Brennan* reformed the policy," that is, the date the Policy first should have been reformed by the trial court.

(3) the degree of injustice or hardship reformation from a particular effective date would cause the parties. *Warren*, 555 F.3d at 1149. These factors have been referred to as the "*Clark I* factors" after the Tenth Circuit opinion in *Clark v. State Farm Mutual Automobile Insurance Co.*, 319 F.3d 1234 (10th Cir. 2003) ("*Clark I*"). The Tenth Circuit, in its opinion remanding the present case, noted that "[t]hese factors do not necessarily have equal weight but are to be evaluated on the basis of the strength of the equitable and policy considerations underlying each." *Warren*, 555 F.3d at 1149.

Kirk Warren asserts that an appropriate reformation date would be March 13, 2002, the renewal date of the Policy just prior to his accident.[5] Liberty Mutual disagrees and urges instead that the Court select February 27, 2009, the date the Tenth Circuit denied rehearing of the order which held that Kirk Warren was entitled to reformation as a matter of law. For the reasons explained below, I agree with Kirk Warren that March 13, 2002 is the appropriate effective date of reformation of the Policy.

By March 13, 2002, Liberty Mutual still had not made Deborah Bannister and Kurt Warren an offer of APIP coverage which included guest occupants and

---

[5] It is not entirely clear that the renewal date of the Policy equates precisely to the Tenth Circuit's suggestion of "the date the policy was issued." *Cf. Breaux v. American Family Mut. Ins. Co.*, 554 F.3d 854, 864-65 (10th Cir. 2009) (discussing the nature of insurance policy renewals). However, the dates suggested by the Tenth Circuit were characterized as "[p]ossible dates," leaving open the possibility of others. The renewal date of the Policy is at least analogous to the Tenth Circuit's suggestion, it was the date at which the policy term in question began, and it is the last date before the accident that Liberty Mutual sent correspondence to the insureds. Therefore, the renewal date is a suitable possibility.

pedestrians.[6]  It was Liberty Mutual's failure to make such a compliant offer that led the

Tenth Circuit to conclude that, as a matter of law, Kirk Warren was entitled to

reformation.  Liberty Mutual continues to argue that it did, in fact, make an adequate

offer to these insureds.  However, absent special circumstances – none of which Liberty

Mutual argues are present here – the Tenth Circuit's conclusion controls.  *Cf. Been v.*

*O.K. Indus., Inc.*, 495 F.3d 1217, 1224 n.4 (10th Cir. 2007) ("This Court had recognized

three 'exceptionally narrow' grounds supporting a district court's departure from an

appellate court's earlier ruling: (1) when the evidence in a subsequent trial is

substantially different; (2) when controlling authority has subsequently made a contrary

decision of the law applicable to such issues; or (3) when the decision was clearly

erroneous and would work a manifest injustice." (internal quotation marks omitted)).

Furthermore, Liberty Mutual should have fully anticipated the rule in *Brennan* by

March 13, 2002, after which time it was no longer reasonable for Liberty Mutual to rely

on its practice of excluding guest occupants and pedestrians from additional APIP

coverage.  Liberty Mutual was aware of the full requirements of CAARA by this date

and any reliance on previous interpretations was no longer reasonable.  Courts have

interpreted § 10-4-710(2)(a) as requiring an offer of APIP benefits to guest occupants

and pedestrians as far back as the date that the 1992 amendments to CAARA went

into effect.  *See*, *e.g.*, *Clark I*, 319 F.3d at 1241-1242.  Any uncertainty regarding this

requirement was cleared up in 1998 by *Brennan v. Farmers Alliance Mutual Insurance*

---

[6] There is some indication that Liberty Mutual operated under the misconception
that it was not required to make an amended, fully compliant offer to Ms. Bannister and
Kurt Warren.  *See* Br. Re: Effective Date of Reformation [Docket No. 119], ex.10 at 4-5
(internal pagination 43-47).

*Co.*, 961 P.2d 550 (Colo. App. 1998).  Liberty Mutual admits that it was aware of *Brennan* by August of 2001 when it received a bulletin regarding the case and its requirements.  *See* Def.'s Resp. Re: Reformation Date at 8 ¶ 25.  Indeed, Liberty Mutual even acted on this notice by amending its APIP endorsement and crafting additional documents for distribution to its policyholders.

As the renewal date just prior to the accident, March 13, 2002 represents the day on which Liberty Mutual's failure to make a compliant offer matters in this case.  The renewal of the policy provided Liberty Mutual with an opportune moment to correct the defects in its offer to Deborah Bannister and Kurt Warren.  Having failed to take this opportunity, Liberty Mutual cannot now argue that it suffers some unfair result due to its reliance on past practices.  Therefore, with respect to the first factor – the degree to which a particular effective date would upset past practices on which the parties may have relied – I conclude that reforming the Policy as of March 13, 2002 fairly accounts for the parties' reliance on past practices and does not force upon Liberty Mutual unexpected consequences from the *Brennan* case.

I now turn to the second factor outlined by the Tenth Circuit's remand order: how reformation from a particular effective date would further or retard the purpose of the rule in *Brennan*.  The court in *Brennan* explained that "[t]he purpose of the No-Fault Act is to avoid inadequate compensation to all victims of automobile accidents."  *Brennan*, 961 P.2d at 553 (citing *Coffman v. State Farm Mut. Auto. Ins. Co.*, 884 P.2d 275 (Colo. 1994)).  Furthermore, the court explained that "[t]he No-Fault Act is to be liberally construed to further its remedial and beneficent purposes."  *Brennan*, 961 P.2d at 553.

28

Section 10-4-710(2)(a) advances the purpose enunciated in *Brennan* by forcing insurers to offer their insureds all of the statutorily described enhanced coverage, while still allowing insured parties to decline the additional benefits. *Brennan*, 961 P.2d at 554 ("[A]ll that is required is that the insurer *offer* these extended benefits" (emphasis in original)). Courts encourage insurers' compliance with the offer requirement in § 10-4-710(2)(a) by reforming the policy to include any coverage that an insurer fails to adequately offer. *See Brennan*, 961 P.2d at 556.

If courts were to do as Liberty Mutual suggests and presumptively set the reformation date as the date on which an order first commands reformation, regardless of whether the insurer had good reason to withhold coverage, the goal of encouraging compliance with CAARA and § 10-4-710(2)(a) would suffer. Such a rule would allow insurers to delay in making compliant offers of coverage and could virtually eliminate bad faith claims in these cases. Furthermore, once an insurer discovered that it would be liable for failing to make a fully-compliant offer, there would be no incentive to expeditiously provide the neglected coverage. Instead, insurers would be encouraged in virtually every case to delay payment and to engage in lengthy litigation in order to forestall a reformation order and the resulting payment of benefits. Such a result would seriously undermine the goals of CAARA.

In the present case, I find that setting March 13, 2002 as the date of reformation would advance, rather than retard, the purposes of CAARA. Setting this date encourages prompt compliance with the terms of § 10-4-710(2)(a). Granting Liberty Mutual's request of the date of the Tenth Circuit's opinion permits the delays in complying with CAARA that Liberty Mutual is guilty of in this case. Therefore, because

holding Liberty Mutual accountable for its delay in complying with the commands of CAARA would advance the purposes behind that Act, the second factor favors the March 13, 2002 reformation date.

With respect to the third equitable factor, I conclude that, although Liberty Mutual may face substantial potential hardship if a date other than February 27, 2009 is selected, this hardship is neither unfair, nor a certainty.  Selecting the date of the Tenth Circuit's denial of rehearing in this case would insulate Liberty Mutual from Kirk Warren's additional breach of contract and bad faith claims.  On the other hand, selecting March 13, 2002 would expose Liberty Mutual to these claims and the additional damages they may carry.

By simply reviving these claims, there is no guarantee that Kirk Warren will prevail.  It is true, for example, that "when the insurer unreasonably and in bad faith withholds payment of claims of its insured, it is subject to liability in tort."  *Brennan*, 961 P.2d at 556 (citing *Farmers Group, Inc. v. Trimble*, 691 P.2d 1138 (Colo. 1984)). However, the viability of those claims depends on an independent analysis of "whether the conduct was unreasonable and whether the insurer had knowledge or acted in reckless disregard of the fact that the conduct was unreasonable."  *Brennan*, 961 P.2d at 556 (citing *Brandon v. Sterling Colo. Beef Co.*, 827 P.2d 559 (Colo. App. 1991)). Indeed, not only may an insurer challenge "fairly debatable" claims, *Brennan*, 961 P.2d at 557, it has a duty to its shareholders and policyholders to do so.  *May*, 263 F. App'x at 682 (citing *Bailey v. Allstate Ins. Co.*, 844 P.2d 1336, 1340 (Colo. App. 1992)). Therefore, where "an insurer maintains a mistaken belief that the claim is not

compensable, it may be within the scope of permissible challenge even if its belief is incorrect." *Brennan*, 961 P.2d at 557.

Liberty Mutual attempts to combine the substantive bad faith determination with the question of the date of reformation. However, I find such an approach to be imprudent. Briefing on the substantive issues of Kirk Warren's additional claims is not before the Court. Therefore, it is unclear at this point whether Kirk Warren will be successful on those claims. Moreover, the Court's decision regarding the reformation date is not changed by the fact that Liberty Mutual may then face additional claims. Because these additional claims are based on legal premises of which Liberty Mutual was aware at the time of its alleged breaches, it is not unfair to require Liberty Mutual to defend against the substance of those claims.

On the other hand, Liberty Mutual's desired date of reformation, February 27, 2009, would completely foreclose Kirk Warren's ability to litigate the merits of these claims. As a result, Kirk Warren would face potential injustice and hardship of his own should these claims be precluded as a threshold matter by the date of reformation. Therefore, the third equitable factor also favors Kirk Warren.

Having concluded that the three factors enumerated by the Tenth Circuit all favor the reformation date suggested by Kirk Warren, I now address a number of additional issues raised by Liberty Mutual. For example, Liberty Mutual argues that I should set the reformation date as the date of the order commanding such reformation, here the date of the Tenth Circuit's denial of rehearing, because that is the date courts have selected in other cases. *See* Resp. in Opp'n to Pl.'s "Br. Re: Effective Date" [Docket No. 121] ("Def.'s Resp. Re: Reformation Date") at 12 (citing *Breaux*, 554 F.3d at 868;

31

*May*, 263 F. App'x at 682; *Clark II*, 433 F.3d at 712-13).  I first note that the courts in these cases, after explicitly acknowledging the district court's discretion in selecting a reformation date, merely upheld the decisions of the district courts.  *See Clark II*, 433 F.3d at 712-13; *Breaux*, 554 F.3d at 867-68; *May*, 263 F. App'x at 681-82 & n.4.  These cases do not *require* that the date of reformation be the date of the reformation order.

Furthermore, these cases are distinguishable.  *May* involved "*an actual offer of APIP benefits* in a commercially unreasonable manner in conjunction with *Parfrey*," rather than a "failure to offer APIP to the same class of individuals entitled to 'Basic PIP,' such as pedestrians."  *May*, 263 F. App'x at 678 (emphasis in original).  As a result, the district court in *May* determined that unlike the latter situation, where "a case could be made for retroactive reformation," application of *Parfrey* to APIP offers had not been developed in the case law.  *May*, 263 F. App'x at 678-79.  In the present case, the Tenth Circuit analyzed Liberty Mutual's APIP offer regarding named insureds such as Kurt Warren under *Parfrey*.  *See Warren*, 555 F.3d at 1145-46.  However, contrary to Liberty Mutual's assertions, the Tenth Circuit did not do the same with respect to the class that remains relevant to this case – guest occupants such as Kirk Warren.  *See Warren*, 555 F.3d at 1146-47.  Instead, the Tenth Circuit found that Liberty Mutual failed to make any offer of APIP coverage for guest occupants, *see Warren*, 555 F.3d at 1147, and *Parfrey* is irrelevant.  Unlike the situation faced by the insurer in *May*, the case law controlling this case was not undeveloped and Liberty Mutual should have been fully aware of its duties under CAARA.  Having failed to comply with this law, Liberty Mutual now faces the consequences prescribed by that case law.

The district court in *Breaux* faced similar circumstances, that is, an insurer who offered APIP coverage for all covered classes but whose offer was alleged to have been insufficient.  The court explained that "[n]o court had previously analyzed or defined the parameters of whether or when an offer is reasonably calculated to allow a purchaser an opportunity to make an informed decision."  *See Breaux v. American Family Mut. Ins. Co.*, No. 04-cv-00191-EWN-MJW, 2007 WL 496697, at *7 (D. Colo. Feb 13, 2007).  As a result, it was "irrefutable that Defendant should not necessarily have anticipated it would have to pay enhanced PIP benefits."  *Breaux*, 2007 WL 496697, at *7.  On appeal, the Tenth Circuit upheld this conclusion because "[t]here is no indication that the district court erred in its judgment or exceeded the bounds of permissible choices in these circumstances."  *Breaux v. American Family Mut. Ins. Co.*, 554 F.3d 854, 867 (10th Cir. 2009).  Therefore, for the same reasons *May* is distinguishable, so is the *Breaux* case.

Finally, in *Clark II*, the district court opted to set the date of reformation as the date of its reformation order because setting it as the date the policy issued would have exposed the insurer to what was perceived to be unfair retroactive liability.  *See Clark II*, 433 F.3d at 712.  The court was unwilling to impose upon the insurer potential liability under *Brennan* during a period of time prior to the issuance of that opinion, and the Circuit Court upheld that decision.  *Clark II*, 433 F.3d at 712-13.  Here, because March 13, 2002 falls several years after the release of *Brennan*, those same concerns are not present.

33

As one final note, even if it I were to decline Kirk Warren's suggested date of reformation, Liberty Mutual's proffered date is perhaps the least acceptable of the choices before the Court.  As discussed above, based on the case law surrounding offers of APIP benefits, Liberty Mutual should have foreseen from the outset of this case that it was likely that the Policy would be reformed to provide APIP benefits to Kirk Warren.  However, when Judge Nottingham issued his summary judgment order on February 15, 2007, that likelihood became a near certainty.  Judge Nottingham found that Liberty Mutual violated § 10-4-710(2)(a) with respect to guest occupants and pedestrians.  *See Warren v. Liberty Mut. Fire Ins. Co.*, 505 F. Supp. 2d 770, 779-80 (D. Colo. 2007).  In doing so, he rejected as distinguishable on the facts Liberty Mutual's reliance on *Hill v. Allstate Insurance Co.*, No. 04-cv-0865-REB-CBS, 2006 WL 229202 (D. Colo. Jan. 24, 2006), *aff'd*, 479 F.3d 735 (10th Cir. 2007).  *See Warren*, 505 F. Supp. 2d at 778-79.  The only reason summary judgment entered in favor of Liberty Mutual on Kirk Warren's reformation claim was that Judge Nottingham found that Kirk qualified as a "family member," not a "guest occupant."  *See Warren*, 505 F. Supp. 2d at 780-81.  When Kirk Warren challenged this conclusion in a Rule 59 motion [Docket No. 71], Liberty Mutual's response [Docket No. 73] took no position as to the proper characterization of Kirk Warren.  Instead, Liberty Mutual reasserted its previously rejected argument based on the *Hill* case, which in the interim had been affirmed by the Tenth Circuit, *see Hill v. Allstate Insurance Co.*, 479 F.3d 735 (10th Cir. 2007).  Not until pressed at oral argument on appeal before the Tenth Circuit did Liberty Mutual finally admit that Kirk Warren was not a "family member" as that term is used in the Policy.

34

Therefore, when Judge Nottingham issued his order on February 15, 2007, a court had adjudicated Liberty Mutual to have violated § 10-4-710(2)(a) by failing to offer Deborah Bannister and Kurt Warren APIP coverage for guest occupants and pedestrians.  Furthermore, Liberty Mutual knew that *Hill* would not serve as a defense and that Kirk Warren was a guest occupant.  Therefore, with no additional legal questions to be answered, it was clear that Kirk Warren was entitled to reformation. However, in responding to the Rule 59 motion, rather than being candid to the Court about Kirk Warren's status as a "guest occupant," Liberty Mutual chose silence and continued litigating this case.  As a consequence, Liberty Mutual's silence will not be rewarded in this Court's equitable analysis by imposing a reformation date that extended beyond February 17, 2007, the point in time when Liberty Mutual should have known with virtual certainty that Kirk Warren was entitled to reformation.

### C.  Ancillary Matters

Because I selected March 13, 2002 as the date as of which the Policy is to be reformed, Kirk Warren's additional breach of contract and bad faith claims are not automatically precluded.  As a result, these claims are again at issue in this case and may proceed.

## III.  CONCLUSION

On appeal of this case, the Tenth Circuit concluded that plaintiff Kirk Warren was entitled to reformation of the Policy by adding APIP benefits covering guest occupants like himself.  The Tenth Circuit remanded the case to this Court to determine the details of that reformation.  In particular, the remand order charged the Court with determining

(1) whether an aggregate cap should be placed on the coverage and (2) as of what date the reformation should be made effective.  For the reason explained above, I conclude that, as a matter of law, the Policy does not contain an aggregate cap, and should not be reformed to include one, and that the Policy is deemed reformed as of March 13, 2002.  Therefore, it is

**ORDERED** that plaintiff Kirk Warren's motion for partial summary judgment regarding the aggregate cap issue [Docket No. 99] is GRANTED and no aggregate cap shall be placed on the reformed insurance policy.  It is further

**ORDERED** that defendant Liberty Mutual Fire Insurance Company's cross-motion for partial summary judgment on the aggregate cap issue [Docket No. 111] is DENIED.  It is further

**ORDERED** that plaintiff Kirk Warren is entitled to summary judgment on the reformation date issue.  The Policy is deemed to be reformed as of March 13, 2002.  It is further

**ORDERED** that plaintiff Kirk Warren's claims for breach of contract, willful and wanton statutory bad faith, breach of the implied covenant of good faith and fair dealing, and common law bad faith may proceed in this case.  It is further

**ORDERED** that any Final Judgment entered upon resolution of all claims against all parties shall reflect the rulings in this order.

DATED February 19, 2010.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge